UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

—————————————————————

| | |
|---|---|
| C.A.I., Inc., | ) |
| | ) |
| Plaintiff and | ) |
| Defendant in Counterclaim, | ) |
| | ) |
| v. | ) |
| | ) |
| VITEX PACKAGING GROUP, INC. and | ) |
| VITEX PACKAGING, INC. | ) |
| | ) |
| Defendants and | ) |
| Plaintiffs-in-Counterclaim. | ) |

Civil Action No. 1:13-CV-11272-LTS

—————————————————————

**MEMORANDUM AND ORDER ON
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**July 17, 2015**

SOROKIN, J.

I.    INTRODUCTION

C.A.I., Inc. ("CAI"), makes and sells commercial ink and ink products. Vitex Packaging

Group, Inc. and Vitex Packaging, Inc., (collectively "Vitex"), print tea labels and tea envelopes

for its customers.  From about September of 2010, to about December of 2010, Vitex purchased

some inks from CAI on a "straight bill" basis. Vitex evaluated the ink products and decided to

purchase more substantial quantities of ink from CAI.  After some oral discussions, during which

Vitex made clear it did not want to enter into a binding relationship of any set duration, Vitex

and CAI agreed to a form of consignment arrangement.  Beginning in early 2011, CAI shipped

ink to Vitex.  Each month, a CAI employee visited the Vitex plant to determine which ink

containers Vitex had opened during the previous month.  Armed with this information, CAI sent

an invoice to Vitex for each container Vitex had opened.  CAI issued the first invoice for

consignment ink in February of 2011. Vitex paid this invoice. The parties repeated this process

each month thereafter until March of 2013, when Vitex terminated the relationship. At the end of

the relationship, Vitex refused to pay four invoices issued by CAI: February 28, 2013 (invoice #

64252); March 28, 2013 (invoice # 64545); April 4, 2013 (invoice # 64545A), and; April 15,

2013 (invoice # 64749).

CAI brought a one count Complaint for Breach of Contract against Vitex seeking as

damages the amount of the four unpaid invoices. It now seeks Partial Summary Judgment on its

Breach of Contract Claim as to three out of the four invoices. Vitex Cross-Moves for Summary

Judgment on CAI's claim seeking payment for three invoices. The parties agree that Vitex had

the right to return unopened containers of ink without charge or penalty. The dispute now

concerns one or both of the following two categories of ink: (1) unopened containers Vitex

decided to keep (and later used either for printing purposes or to prepare for this litigation); and,

(2) so-called "work-off ink," which is ink that Vitex recovered from a printing run and saved for

future use.

Vitex has brought its own claims against CAI.  It has Counterclaims for: (1) Declaratory

Judgment that the "Additional Terms" on CAI's invoices are not binding or enforceable; (2)

Breach of Contract; (3) Breach of the Implied Covenant of Good Faith and Fair Dealing; (4)

Breach of the Implied Warranty of Merchantability; (5) Breach of the Implied Warranty of

Fitness for a Particular Purpose; (6) Breach of Express Warranty; (7) Deceptive Business

Practices, Chapter 93A; (8) Tortious Interference with Contractual Relations; (9) Tortious

Interference with Advantageous Relations; (10) Fraudulent Misrepresentation; and (11)

Negligent Misrepresentation. Vitex now moves for Summary Judgment on all eleven (11) of its

2

Counterclaims seeking over $1 million in damages.  Finally, Vitex's Counterclaim for

Declaratory Judgment that the "Additional Terms" listed on the back side of CAI's monthly

invoices are not enforceable, presents a substantial dispute raised by Vitex's motion and CAI's

opposition. The Court treats CAI's opposition as a cross-motion, on this issue only. The parties

were notified of the Court's treatment on this one issue, and they were provided an opportunity

for further briefing. The Court held a hearing on June 17, 2015. All pending motions relating to

summary judgment are now ripe for decision.

II.      Material Facts

      The material facts set forth herein are undisputed except where otherwise noted.[1]

      CAI, located in Georgetown, Massachusetts, is a family-owned company that

manufactures inks and coatings for the printing industry. (Doc. 48 ¶ 3.) CAI was founded by

Vincent Sartorelli and his son Michael Sartorelli in 1985. (Vince Sartorelli Aff. ¶ 1.) Vincent is

CAI's President, his son, Mike Sartorelli is CAI's Technical Director, and another son, Paul

Sartorelli is CAI's Treasurer. (RVSOF ¶ 1.) Vitex Packaging, Inc. is a subsidiary of Vitex

Packaging Group, Inc., located in Suffolk, Virginia. (Doc. 47 at ¶ 2.) Vitex manufactures printed

tea tags and envelopes for tea companies. (Id.) Vitex uses ink and ink products for printing its tea

tags and tea bag envelopes, which Vitex then sells to its customers. (Id.)

---

[1] Further, CAI's statement of facts is referenced as "CSOF." Vitex's statement of facts is
referenced as "VSOF." CAI's responses to VSOF are referenced as "RVSOF." Exhibits 1
through 126 refer to the three binders of exhibits submitted to the Court by the parties in
connection with Vitex's Motion for Summary Judgment. Exhibits referenced as letters "A-T" are
exhibits submitted in connection with CAI's Motion for Partial Summary Judgment. The Court's
citations to the record are fashioned in this way because either the record or the briefs were not
filed on ECF or, if filed, were too heavily redacted to cite as ECF documents. The Court has now
unsealed the entire summary judgment record. (Doc. 129.)

In September of 2010, CAI began providing small amounts of water-based ink products to Vitex, on a "straight charge basis." (Ex. 3, Paul Sartorelli Depo. at 16.) At that time, CAI shipped the ink along with its invoice. (Id.)  Then in January of 2011, Robert Hummel, on behalf of Vitex, went to CAI's manufacturing plant in Georgetown. (Ex. 76, Hummell Depo. at 52.) Hummel met with Hoyle Cecil of CAI. (Ex. 10, Cecil Depo. at 40.)  Hummell testified at deposition that it was his idea to request that CAI provide ink to Vitex on a "consignment" basis. (Ex. 76, Hummell Depo. at 53.) According to Hummell, this arrangement allowed Vitex to "bring in product and basically it freed up cash for [Vitex] because it didn't hit [Vitex's] books until" after a "55-gallon drum" was opened. (Id.) At that meeting, Cecil (on behalf of CAI) agreed to provide Vitex with whatever quantity of ink Vitex needed on a consignment basis. (Ex. 10, Cecil Depo. at 40.) Also at that time, the parties discussed contract pricing, technical support and notice in case of a pricing increase. (Ex. 76, Hummell Depo. at 52.) Cecil testified at deposition that he knew Vitex did not want to enter into a formal written agreement because it did not want to be bound to any supplier for any set period of time. (Ex. 10, Cecil Depo. at 41.) There is no testimony, no affidavit, no evidence submitted from anyone at Vitex regarding any discussions of other terms at that time.

Shortly after the meeting, CAI shipped ink to Vitex in accordance with the parties' oral arrangement reached at the January 2011 meeting. (Ex. 77.) According to Hummell, Vitex would order the ink from CAI, and CAI would ship the ink. (Ex. 76, Hummell Depo. at 53.) Then Vitex would "use" some containers of ink. At the end of every month, Cecil would go to Vitex's plant and with a representative of Vitex, and they would determine the amount of ink Vitex "used" that month. (VSOF ¶¶ 12, 137; CSOF ¶ 10.)  For billing purposes, the undisputed facts establish

that, for any pail, drum or tote of CAI ink opened during the month, CAI would bill Vitex for the entire pail, drum or tote rather than the specific quantity of ink actually used. (Id.)

The first invoice issued in connection with the consignment agreement was on February 28, 2011. (Ex. 77.)  According to Vitex, CAI sent the same invoice to all its customers and Vince Sartorelli testified that he believed and hoped that the invoice was sent to all customers for CAI's protection. (Ex.1, Vince Sartorelli Depo. at 52.) The back of every invoice contained "Additional Terms."  Approximately twenty eight (28) such invoices were sent to Vitex from between February of 2011, to March of 2013. (Ex. 77 and Exs. C, G, H.) During the parties' relationship, Vitex never raised any objection to the terms contained on CAI's invoice.

Beginning in March of 2012, after Vitex had received and paid approximately fourteen monthly invoices, (Ex. 77), Vitex did make complaints regarding the quality of CAI's products. (VSOF ¶ 30.) However, it voiced no concern or objection about the additional terms.  At no time, until this litigation, did Vitex complain about the terms of the invoice or seek any accommodation from CAI with respect to its ink that might otherwise indicate an implicit objection to (or acceptance of) the terms. In addition, Vitex has submitted no affirmative evidence denying knowledge of the terms on the invoices, nor has it submitted or identified any evidence suggesting it was otherwise unaware of the additional terms on the invoices. There is also no evidence of express agreement by Vitex, and no evidence CAI discussed the terms with Vitex.

During the course of the parties' relationship, Vitex purchased from CAI ink bases which are colors that can be mixed to produce additional colors, and a varnish or coating known as a "clay extender." (VSOF ¶ 5.) "Virgin ink" is ink that was not mixed with any other ink. (VSOF ¶ 128.) "Work-off ink" was ink that was essentially left over from a printing run and used again—

sometimes mixed with virgin ink and sometimes mixed with other work-off ink. (RVSOF ¶ 6.)
From approximately January of 2011, to approximately March of 2013, Vitex purchased over
900,000 pounds of ink from CAI, (Ex. 77 and Ex. C, G and H), and 475,000 pounds of ink
products from other ink suppliers. (RVSOF ¶ 3.)

Vitex claims that CAI's ink was "contaminated" with mold and bacteria which caused the
tags or other printed materials to smell bad, which in turn caused them substantial damages.
(Vitex Memo SJ at 4-5.) The undisputed evidence demonstrates that out of Vitex's 100 or more
customers, three of Vitex's customers' complained about odor. (RVSOF ¶ 2.) CAI denies that
the virgin ink it provided to Vitex was contaminated. CAI points to evidence indicating many
other possible causes for the any alleged bad smell. First, CAI argues that the undisputed
evidence shows that Vitex regularly used work-off ink for which Vitex had no quality control.
For instance, an orange ink that was used for Bigelow was made exclusively with work-off ink.
(Ex. 78.) According to CAI, Vitex has no way of knowing whether this work-off ink, or any
other press run made exclusively with work-off ink, contained (exclusively) CAI ink or extender.
(RVSOF ¶ 6.) When CAI took over as Vitex's ink supplier, Vitex had a large amount of work-
off ink in its ink room that could only have been comprised of ink from previous suppliers. (Ex.
80, Cecil Depo. at 121–123.) It also had ink that was specifically labeled as the property of
previous suppliers, including a supplier that had, by that time, not been Vitex's ink supplier for
approximately four years. (Id..) The lack of ability to specifically track or trace work-off ink is
consistent with testimony from Vitex representatives. (Ex. 76, Hummel Depo. at 67-68.) (Ex. 88,
Johnson Depo. at 44-43.) There is also evidence that the cleanliness and organization in Vitex's
ink room was sub-standard. (Ex. 88, Johnson Depo. at 36- 37; Ex. 80, Depo. Cecil at 124.) Vitex
puts forth no evidence disputing the described condition of its facility, nor has Vitex submitted

contrary evidence directly disputing the basis for these witness' testimony, nor any other evidence suggesting the conditions were other than as described.

The crux of Vitex's claims, is that CAI attempted to add "biocides" to its ink which inhibits the growth of mold and bacteria, but it did this without Vitex's knowledge and in an effort to hide the fact that CAI's ink was contaminated. (Vitex Memo SJ at 4-5.) CAI denies these allegations, and states its products always had the requisite biocides. (RVSOF ¶ 15.) While both parties point to some evidence in the voluminous record supporting their respective positions regarding contamination, the parties hotly dispute the significance of certain test results, the context in which tests were reported, the methodology used to test samples, the import and meaning of communications relating to quality and testing of the ink, as well as the authenticity of statements made during meetings relating to the ink. See e.g. infra at Section IV C.

Against this backdrop, the Court now turns to the parties' respective motions.

III.    LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once a party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  Further, a court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrell, 477

U.S. 317, 322 (1986). The Court is "obliged to view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993). Even so, the Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation." Prescott v.Higgins, 538 F.3d 32, 39 (1st Cir. 2008) (quoting Medina-Munoz v. R.I. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

IV.    DISCUSSION

A.  CAI's Breach of Contract Claim

CAI's breach of contract claim presents the first issue before the Court. CAI seeks summary judgment on three of its four invoices—dated February 28, 2013, March 28, 2013 and April 4, 2013, (Exs. C, G and H), totaling approximately $207,000. Vitex cross-moves on the entire claim. The parties do not dispute the existence of a contract, delivery, acceptance or non-payment.  The dispute, as framed by the parties now, (Doc. 123 at 6-8,12), concerns ink billed under these outstanding invoices, used by Vitex and then retained by Vitex as work-off ink. The issue then, is whether Vitex properly revoked acceptance of that portion of its work-off ink on March 15, 2013, when it terminated the parties' relationship, for which it had been charged on the invoices giving rise to CAI's claim. [2]  To be clear, CAI's claim, and thus its Motion for

---

[2] The parties report that CAI previously credited Vitex for unopened containers of ink it returned and that the claim does not concern any virgin ink retained by Vitex. Insofar as Vitex maintains that it was entitled to keep unopened ink (either for later printing use or for litigation purposes) and refuse to pay for it (the Court is not entirely clear whether Vitex maintains this position), the position borders on the frivolous in these circumstances. Vitex has cited no provision of the Uniform Commercial Code that both permits revocation of acceptance by a merchant- buyer of commercial goods and permits the merchant-buyer to retain the good for ongoing future use by refusing to return it without any payment whatsoever.  That neither parties' papers carefully explains exactly what types of ink are in dispute on the breach of contract claim has complicated the issue.

Partial Summary Judgment, does <u>not</u> concern all of the work-off ink in Vitex's possession now, but only the work-off ink to which the open invoices pertain.[3]

With respect to revocation of accepted goods, the UCC provides:

> (1)  The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it
> (a)  on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or
> (b)  without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.
> (2)  Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.
> (3)  A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.

Mass. Gen. Laws ch. 106, § 2-608.[4]

To revoke, Vitex need not prove that the ink was definitively contaminated. Rather, it must establish that the alleged defects "substantially impair[ed] the value of goods to" Vitex. <u>Fortin v. Ox-bow Marina, Inc.</u>, 557 N.E.2d 1157, 1161 (Mass. 1990). "Most courts read this test as an objective, or common sense, determination that the impaired value of the goods ***to the buyer was substantia****l* as opposed to trivial, or easily fixed, given his subjective needs….The evaluation is made in light of the 'totality of the circumstances' of each particular case, including the number of deficiencies and type of nonconformity and the time and inconvenience spent in downtime and attempts at repair. <u>Id</u> (emphasis added.); <u>accord</u> <u>Novacore Tech., Inc. v. GST</u>

---

[3] To the extent Vitex wishes to press claims for work-off ink it had previously accepted and paid for pursuant to earlier invoices, it must do so pursuant to its counter-claims.

[4] The parties cite the Massachusetts version of the UCC and neither party advances an argument for the application of the law of any other forum.

Comm. Corp., 20 F.Supp. 2d 169 (D. Mass. 1998) (all reasonable leeway must be given to

rightfully revoking buyer).  Moreover:

> [I]in the proper circumstances, even cosmetic or minor defects that go unrepaired
> despite a number of complaints or attempts at repair, or remaining minor defects
> after an earlier, serious problem has been repaired, or defects which do not totally
> prevent the buyer from using the goods, but circumscribe that use or warrant
> unusual or excessive maintenance actions in order to use, can substantially impair
> the goods' value to the buyer. Experiencing in a major investment a series of
> defects, even if some have been cured and others are curable, can shake a buyer's
> faith in the goods, at which point "the item not only loses its real value in the buyer's
> eyes, but also becomes an article whose integrity has been substantially impaired
> and whose operation is fraught with apprehension."

Fortin, 557 N.E.2d at 1161 (internal citations omitted).

Vitex has satisfied this test.  In March of 2012, Bigelow returned tea labels printed with

CAI ink complaining, at least in part, of a "material odor." (Ex. 20.)  Both parties treated the

complaint seriously during the next several months.  CAI sent certain samples to an outside

vendor; CAI began adding a (or another) biocide to some of its inks; Vitex hired its own

consultant; and the parties had numerous communications about the smell issue.  Despite these

efforts (and further testing and discussions later in 2012), and to resolve possible concerns by

Bigelow, as of the fall of 2012, and no later than November of 2012, Vitex replaced CAI as the

supplier for ink for Bigelow products. (RVSOF ¶ 27.)

Vitex continued to perceive problems with CAI's ink.  For example, on February 21,

2013, Vitex's Quality Director tested ten different CAI dispensed inks and two drums.  She

found all of the containers contaminated with mold. (VSOF ¶ 133.)[5]  On March 12, 2013, a

second Vitex customer, Reily Food Company, rejected products because of "an extremely

---

[5]CAI contends that the tests were not conducted properly. Even if CAI is correct, for purposes of
revocation, this is irrelevant. There is no evidence that she did so knowingly. The results were,
therefore, information upon which Vitex could rely in 2013, when making its decision to revoke.

unpleasant aroma." (VSOF ¶ 29.)  On March 25, 2013, Vitex terminated the relationship. (Ex. 64.)

Drawing all reasonable inferences in Vitex's favor, the Court finds that the "non-conformity," i.e. that some or all of CAI's ink alone or in combination with other products used by Vitex in its plant may have caused some odors, substantially impaired the value of the goods to Vitex.  This is so even though CAI advances evidence that most of Vitex customers did not complain of odors, that some tests including tests shortly before the termination revealed no contamination, and that the odor may have arisen from other sources.  Considering the duration of the odor concern, the seriousness with which the parties and, at least two Vitex customers viewed the issue, the non-conformity posed a substantial impairment to Vitex.

Nonetheless, for revocation to be effective it "must occur within a reasonable time after the buyer discovers or should have discovered the ground for it **and** before any **substantial change in condition of the goods** which is not caused by their own defects." Mass. Gen. L. ch. 106, § 2-608 (emphasis added). "[T]he purpose of conditioning the right to revoke acceptance on the absence of substantial change in the condition of goods is to prevent the buyer from tendering back to the seller goods which have materially deteriorated for reasons other than the defects for which the seller is responsible." J.F. Daley Int'l, Ltd. v. Midwest Container & Indus. Supply Co., 849 S.W. 260 (Mo. App. 1993). [6]  Here, Vitex (even drawing all reasonable inferences in its

---

[6] There are no analogous or controlling Massachusetts cases which articulate the parameters of what constitutes a "substantial change." In Collection Specialists Int'l v. Roach, 2005 Mass. App. Div. LEXIS 13 (Mass. App. July 22, 2005), where sunflower seeds had been delivered in bags which were not translucent, buyer's rejection under UCC § 2-607 was timely although buyer had repackaged some of the seeds. The court did not consider §2-608. And there, the sunflower seeds were not mixed with any other seeds—that is, other than the re-packaging of the seeds, the seeds did not undergo any change. Cf. Delano Growers' Cooperative Winery v. Supreme Wine Co., 473 N.E.2d 1066 (Mass. 1985) (revocation of non-conforming wine allowed

favor) substantially changed the ink.  The undisputed evidence establishes that Vitex used the work-off ink in the course of printing products and then mixed it with other ink. (VSOF ¶ ¶ 16, 17; RVSOF ¶ 16.)  In these circumstances, Vitex may not revoke acceptance once the ink had been mixed and run through a press.  See Ace Chem. Corp. v. Atomic Paint Co., 229 S.E.2d 55 (N.C. 1976) (acceptance of non-conforming acetone could not be revoked where acetone was mixed with other materials); Toyomenka (America), Inc. v. Combined Metals Corp., 487 N.E.2d 1172 (Ill. App. Ct. 1985) (acceptance of defective steel could not be revoked after steel used to build bridge, but buyer could sue for breach of warranty); W. Paper Co. v. Bilby, 783 P. 2d 980 (Okla. Civ. App. 1989) (acceptance of defective paper could not be revoked where buyer altered paper to make labels and only thereafter discovered the defect; buyer's other remedies remained unimpaired).

Accordingly, CAI's Motion for Partial Summary Judgment, (Doc. 69), is ALLOWED. Vitex owes CAI the face amount of the invoices dated: February 28, 2013 (invoice # 64252); March 28, 2013 (invoice # 64545), and; April 4, 2013 (invoice # 64545A), less a credit for the unopened containers of ink Vitex previously returned. Vitex's Cross-Motion for Summary Judgment on CAI's Breach of Contract claim, (Doc. 63), is DENIED.  CAI's claim for Breach of Contract, arising from the fourth unpaid invoice remains for trial**.**

B.  The Additional Terms

Each invoice CAI issued and Vitex paid during the course of the parties' approximately two-year relationship contained "Additional Terms." (Ex. 77.) The parties dispute whether these additional terms should be incorporated into their consignment arrangement. No evidence before

---

where wine was identified as seller's wine, and there was no issue that the wine had been mixed with some other wine or substance).

the Court suggests that the parties ever discussed these additional terms at any time during the course of their relationship. These terms, nonetheless, bear on many of Vitex's counterclaims.

The Additional Terms excluded consequential damages, excluded warranties, capped damages to the price of the ink and required the application of Massachusetts law:

> THE PARTIES AGREE THAT THE AMOUNT OF DAMAGES ARE LIMITED TO THE PRICE OF THE PRODUCTS CONTRACTED FOR….CAI INC. MAKES NO WARRANTIES, EITHER EXPRESS OR IMPLIED WITH RESPECT TO THE PRODUCT, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OTHER THAN THE STATED REPRESENTATIONS AND WARRANTIES IN THIS AGREEMENT. THE REMEDIES SET FORTH IN THIS AGREEMENT HEREOF ARE IN LIEU OF ALL LIABILITIES OR OBLIGATIONS OF CAI INC. FOR DAMAGES, INCLUDING BUT NOT LIMITED TO SPECIAL, INDIRECT, EXEMPLARY, INCIDENTAL OR CONSEQUENTIAL DAMAGES SUCH AS INTERRUPTION OF BUSINESS OR ANY LOSS OF BUSINESS OR PROFITS, OR ALLEGED NEGLIGENCE, BREACH OF WARRANTY, STRICT LIABILITY, TORT OR CONTRACT ARISING OUT OF THE PRODUCTS CONTRACTED FOR BY THE PARTIES, OR ANY EXPENSE EXPERIENCED BY BUYER ARISING OUT OF ANY DEFECT IN OR FALIURE OR INADEQUACY OF PERFORMANCE OF THE PRODUCT…In no event shall CAI Inc. be liable for special, indirect, incidental or consequential damages arising out of this transaction.

(Ex. 77) (Capitalization in original).[7]

Plainly, the parties entered into a "consignment program," formed orally by the parties in January of 2011, which continued until terminated by Vitex in March of 2013. (Ex. 64.)  Despite

---

[7] The invoice also provides that the "nondefaulting party" may seek from the defaulting party "court costs and reasonable attorney fees in connection with the pursuit of its remedies hereunder." (Ex. 77.) Given the analysis of § 2-207 as applied to the facts and circumstances of this case, I find this provision to have been incorporated into the parties' consignment arrangement. The provision applies equally to both parties—that is, it does not benefit or work a hardship on one party over the other. Moreover, CAI seeks to have this provision apply and Vitex has not argued this particular provision should not apply.

the lack of a formal written agreement, the "basic policy" of the UCC recognizes as a contract

"any manner of expression of agreement, oral, written or otherwise." Mass. Gen. Laws ch. 106, §

2-204, Official Comment. "The legal effect of such an agreement is, of course, qualified by other

provisions" of the Code. Id.  Section 2-207 of the UCC governs "Additional Terms in

Acceptance or Confirmation." See also Official Comment 1 ("This section is intended to deal

with two typical situations. The one is the written confirmation, where an agreement has been

reached either orally or by informal correspondence between the parties and is followed by one

or both of the parties sending formal memoranda embodying the terms so far as agreed upon and

adding terms not discussed."). The full text of § 2-207 provides:

> (1)  A definite and seasonable expression of acceptance or a written confirmation
> which is sent within a reasonable time operates as an acceptance even though it
> states terms additional to or different from those offered or agreed upon, unless
> acceptance is expressly made conditional on assent to the additional or different
> terms.
> (2)  The additional or different terms are to be construed as proposals for addition
> to the contract. Between merchants such terms become part of the contract unless:
>   (a)  the offer expressly limits acceptance to the terms of the offer;
>   (b)  they materially alter it; or
>   (c)  notification of objection to them has already been given or is given within a
>       reasonable time after notice of them is received.
> (3)  Conduct by both parties which recognizes the existence of a contract is
> sufficient to establish a contract for sale although the writings of the parties do not
> otherwise establish a contract. In such case the terms of the particular contract
> consist of those terms on which the writings of the parties agree, together with
> any supplementary terms incorporated under any other provisions of this chapter

Mass. Gen. Laws ch. 106, § 2-207.

The parties agree that subsection (1) governs their arrangement and that the Court should

look to subsection (2) to determine whether the additional terms on the invoices apply.[8] The text

---

[8] The parties are correct. The parties formed an oral agreement in early January. CAI did not make
its acceptance (either at the meeting or on the invoice) expressly conditional on Vitex agreeing to
the additional terms. Commerce & Ind. Ins. Co. v. Bayer Co., 742 N.E.2d 567 (Mass. 2001);

of § 2-207(2) directs that as between merchants, the proposed additional terms become part of the contract, *unless* they fall within one of the lettered exceptions contained in § 2-207(2). [9] The only potential exception either party addresses is lettered subsection (b)—whether CAI's invoice "materially altered" the contract.  If the additional terms of CAI's invoice are immaterial, they will be incorporated into the parties' agreement. Commerce & Indus. Ins. Co. v. Bayer Corp, 742 N.E. 2d 567 (Mass. 2001) (the UCC is only concerned with those terms which are material); I.Lan Sys. V. Netscout Serv. Level Corp., 183 F. Supp. 2d 328 (D. Mass. 2002) ("Between merchants, if a party never objects to the additional terms, and the additional terms are not 'material,' then the UCC deems the party to have accepted the additional terms implicitly, for lack of a better description."). The issue for the Court then, is whether, given the undisputed facts of this case, the terms in CAI's invoice are material alterations. [10]

To begin, the undisputed facts establish Vitex was a "silent buyer." JOM, Inc. v. Adell Plastics, Inc., 193 F.3d 47 (1st Cir. 1999) (en banc). Its "purchase order" (referred to as such by the parties, although not submitted as part of the record), contained no terms conflicting with the additional terms on the invoices.  In response to each invoice containing the additional terms, Vitex said nothing.  In this jurisdiction, as the silent buyer and the party opposing inclusion of

---

Softub, Inc. v. Mundial, Civ. Action No. 12-10619, 2014 U.S. Dist. LEXIS 138274 (D. Mass. Sept. 30, 2014); see also, Official Comment 2.

[9] Vitex also argues that because the invoice came after delivery, the terms therein cannot be incorporated into the parties' agreement. The cases Vitex cited are, in fact, consistent with the approach taken by this Court—those cases direct that where shipment is acceptance, and then seller seeks to add terms by way of an invoice, the terms in the invoice are to be "mere proposal[s] for additional terms, which either would be excluded from or incorporated into the parties' agreement depending upon the outcome of an analysis performed in accordance with section 2-207(2) of the Uniform Commercial Code." Glyptal, Inc. v. Engelhard Corp., 801 F. Supp. 887 (D. Mass. 1992). Even if CAI's shipment of goods was acceptance, the analysis would be the same.

[10] After hearing, the Court gave the parties further opportunity to brief the issue, (Doc. 121), and the parties did submit additional briefing on the issue. (Docs.125 and 126.)

the invoice terms, it is Vitex who must "establish that **it would have** rejected a damages-limitation clause as a 'material alternation,' within the meaning of Section 2-207(2)(b), given all the circumstances surrounding the transaction." JOM, 193 F.3d at 58 (emphasis added); see also SibcoImtrex, Inc. v. Am. Foods Group, Inc., 241 F. Supp. 2d 104, 111 (D. Mass. 2003) (whether a term is material requires a "fact specific, case-by-case analysis to determine whether a proposed term should become part of the parties' contract."). Further, JOM also makes clear that in the context of a silent buyer, whether an alteration is material is not to be decided based on legal considerations arising simply out of the nature of the additional term. JOM, 193 F.3d at 57. Rather, JOM holds that "UCC gap-fillers" are not to be "read into purchase orders as a matter of law," and further, the silence of a buyer in the face of a seller's additional terms, "alone provides no reliable basis for a *per se* rule of exclusion since it leaves open the key question whether the buyer regarded any particular gap-filler term as especially 'material' in the circumstances of the transaction at hand." JOM, 193 F.3d at 58. As explained:

> For instance, [buyer's] purchase order may have omitted a clause precluding any damages-limitation clause, not because the buyer meant to insist that no such term be precluded, but rather, for example, because the parties' course of performance or course of dealing, or the relevant trade usage, establishes that a damages-limitation clause is presumptively included as an implicit term in the contract. **In such a setting, the buyer's silence may simply reflect that it considers a damages-limitation clause 'immaterial' to contract formation.**

JOM at 56 (emphasis added).

As JOM clearly instructs, under these circumstances, Vitex bears the burden of establishing that at the time it entered into the consignment arrangement with CAI, it would have objected to the terms in the invoice. JOM, 193 F.3d at 58. Moreover, Vitex, on its own motion, must bear this burden despite drawing all reasonable inferences in CAI's favor. Vitex has failed to carry its burden. Vitex has offered no evidence whatsoever on whether it "would have"

rejected the additional term.  Vitex has offered no evidence of a course of performance, no evidence of a course of dealing, no evidence of the relevant trade usage and no other evidence whatsoever to carry its burden of proof. This is true despite the Court having given Vitex an additional opportunity to address the issue. (Doc. 121.) Thus, Vitex's Motion for Summary Judgment seeking to establish as a matter of law that the additional terms do not apply is DENIED.

Fairly read, the additional terms are not an indivisible set of terms, but present essentially three sets of additional terms. First, the additional terms purport to limit the amount of damages to the price of the products contracted for. (Ex. 77.) Second, the additional terms purport to exclude "special, indirect, incidental or consequential damages including damages arising out of interruption of business or any loss of business or profits, or negligence, breach of warranty, strict liability, tort or contract arising out of the products contracted or any expense experienced by buyer arising out of any defect in or failure or inadequacy of performance of the product." (Id.) Third, the additional terms purport to exclude all warranties—express or implied. (Id.) For CAI to prevail on its Cross-Motion seeking to establish that the additional terms do apply, it must show, drawing all reasonable inferences in favor of Vitex, that the undisputed evidence renders Vitex unable to show (unable to carry its burden), that the additional terms are material within the meaning of the UCC.  CAI has done this, in part.

I find on the facts of this case, the damage provision limiting the damages to the cost of the product and the provision excluding special or consequential damages arising out of various causes of action are not material alterations as contemplated by § 2-207 (2)(b) and therefore, those provisions are incorporated into the parties' consignment agreement. Vitex bears the ultimate burden on this issue.  Yet, it has produced no evidence whatsoever from which a finder

of fact could determine that it would have, in January of 2011, rejected this limitation.

Moreover, the UCC Comments identify specifically terms "otherwise limiting remedy in a

reasonable manner" and it references specifically §§ 2-718 (providing for limitation of damages),

and 2-719 (providing that consequential damages may be limited or excluded), as "[e]xamples of

clauses which involve no element of unreasonable surprise and which therefore are to be

incorporated in the contract unless notice of objection is seasonably given."  Mass. Gen. Laws

ch. 106, § 2-207 cmt. 5; JOM, 193 F.3d at 57 n.6 ("UCC Official Comments do not have the

force of law, but are nonetheless the most useful of several aids to interpretation and construction

of the [UCC].").  Even drawing all reasonable inferences in Vitex's favor, nothing about the

parties' relationship, the nature of the business, or the ink products themselves makes this

general conclusion inapplicable to the present case.  And, Vitex presents no evidence of

seasonable objection or evidence to the contrary. See also Official Comment 6 ("If no answer is

received within a reasonable time after additional terms are proposed, it is both fair and

commercially sound to assume that their inclusion has been assented to.").

One more point bears mention on the issue of the damages limitation provisions. Vitex

cites Winter Panel Corp. v. Reichhold Chems., Inc., 823 F. Supp. 963, 971 (D. Mass. 1993), in

which the court noted the "prevailing trend," is that damage limitation clauses are material

alterations. Winter Panel, however, was decided in 1993 and before JOM's instruction that the

party opposing a damages limitation clause must "establish that it would have rejected a

damages-limitation clause as a 'material alternation,' within the meaning of Section 2-207(2)(b),

given all the circumstances surrounding the transaction." JOM, 153 F.2d at 58.  Moreover, post-

Winter Panel cases, including a case within this circuit, have incorporated, on summary

judgment, limitation of remedy provision where a buyer had failed to carry its burden of proof

on the issue of materiality. See Dermalogix Partners, Inc. v. Corwood Labs., Inc., Civil No. 99-149-P-C, 2000 U.S. Dist. LEXIS 8009 at *13 (D. Me. March 14, 2000) ("As the party bearing the burden of proof on § 2-207(2) materiality at trial, [Vitex] is not entitled to a second chance at this issue before the jury."); see also Cloplay Plastic Prods. Co. v. Excelsior Packaging Group, Inc., 12-CV-5262 (JPO), 2014 U.S. Dist. LEXIS 132108 (S.D.N.Y. Sept. 18, 2014) (same). [11]

Now, turning to the third category of terms wherein CAI seeks to exclude all warranties—express and implied. "There is a significant difference between a clause excluding all warranties and one limiting the amount of damages" in the event of a breach of that warranty. JOM, Inc. v. Adell Plastics, Inc., 151 F.3d 15, n.8 (1st Cir. 1998) (per curiam), affirmed in part and vacated by JOM, 193 F.3d 47 (en banc).[12] Exclusion of warranties "is usually deemed a 'material alteration' because it eliminates events of breach, and may preclude *any remedy* to the injured buyer." JOM, 151 F.3d at n.8 (per curiam decision). The panel opinion's observation in JOM mirrors Comment 4 to § 2-207 which states, "[e]xamples of clauses which would normally 'materially alter' the contract and so result in surprise or hardship if incorporated without express awareness by the other party are: a clause negating such standard warranties as that of

---

[11]The parties have cited and discussed additional cases considering whether or when a course of conduct may constitute consent to a material alteration for purposes of §2-207. See e.g. Tupman v Woolf Int'l Corp., 682 N.E. 2d 1378 (Mass. App. Ct. 1997); Diskin v. J.P. Stevens & Co., 836 F.2d 47, 51 (1st Cir. 1987) (applying New York law and reasoning that use of same "ineffectual form" not evidence of assent to arbitration clause in light of "vague assertion" of "prior dealings."); Step-Saver Data Sys. Inc. v. Wyse Technology, 939 F.2d 91 (3d Cir. 1991). None of these cases addressed JOM, and because I find that the damage limitation terms to be immaterial given the undisputed evidence in this case, I do not reach the parties' dispute over whether the parties' course of dealing substituted for consent with respect to the damages limitation provisions contained in the invoice.

[12] Although the First Circuit's en banc opinion in JOM fails to include the discussion quoted in the text from the panel opinion, the question of whether a warranty exclusion was material was not presented in JOM and nothing about the en banc opinion suggests a rejection of the comment made by the panel.

merchantability or fitness for a particular purpose in circumstances in which either warranty normally attaches." Mass. Gen. Laws ch. 106, § 2-207, cmt. 4. Moreover, it is undisputed that at all relevant times, Vitex was deeply concerned about the quality of the ink, in large part, because the ink's end use was for food packaging products. (VSOF ¶¶ 11, 14.) And, CAI has presented no evidence to the contrary, nor is there any evidence that Vitex expressly accepted the provision excluding warranties. Vitex has met its burden, even drawing all reasonable inferences in favor of CAI, establishing the warranty exclusions were material alterations. CAI has not shown consent by Vitex, because Vitex's silence in the face of the invoices fails, here, to establish consent. See e.g. SibcoImtrex, 241 F. Supp. 2d at 110 (comparing arbitration clause to exclusion of warranty provision, both which "limit otherwise available remedies—or avenues to remedies—[and] are to be considered material additions that only become effective on an express acceptance."). Under these circumstances, therefore, the exclusion of warranties provisions in the invoice were not incorporated into the parties' agreement.

Accordingly, Vitex's Motion for Summary Judgment as to the limitation of damages and exclusion of consequential damages (identified as categories 1 and 2 above) is DENIED and CAI's Cross-Motion as to these categories is ALLOWED.  Vitex's Motion for Summary Judgment as to the exclusion of warranties provision (identified as category 3 above) is ALLOWED and CAI's Cross-Motion as to this category is DENIED.

C.   Vitex's Remaining Counterclaims

Vitex's Motion for Summary Judgment on its Counterclaims for Breach of Contract (Count 2), and Breach of Good Faith and Fair Dealing (Count 3), Breach of Implied and Express Warranties (Counts 4, 5, and 6), Chapter 93A (Count 7),Tortious Interference with Contractual Relations and Tortious Interference with Advantageous Relations (Counts 8 and 9), Fraudulent

Misrepresentation (Count 10), and Negligent Misrepresentation (Count 11), is DENIED due to the presence of numerous disputed issues of material fact.[13] While nothing further is required, counsel plainly invested substantial efforts in the summary judgment papers on the issues of contamination and CAI's purported misrepresentation and fraud. Accordingly, the Court will, briefly, identify just some of the disputed issues of fact for the benefit of the parties.

On summary judgment, the Court must resolve all factual disputes in the favor of the non-moving party. This means that when Vitex submits notes from a telephone meeting conducted on May 25, 2012, asserting that Mike Sartorelli from CAI said "we tried to grow mold for three weeks and could not," (Ex. 34), but Sartorelli says under oath that neither he nor anyone else at the meeting from CAI made such a statement, (Ex. 75 ¶ 11), then the law <u>requires</u> the Court to credit Sartorelli's statement on summary judgment and disregard Vitex's conflicting evidence. Thus, Vitex is simply wrong when it says that the statement attributed to Sartorelli is "undisputed." (Vitex Reply Memo at 5.) It is disputed. These are basic summary judgment

---

[13] However, the application of the damages limitation provisions to these claims will impact the amount of any damages should the parties proceed to trial. <u>See e.g.</u>  <u>Deerskin Trading Post, Inc. v. Spenser Press, Inc.</u> 495 N.E.2d 303 (Mass. 1986)(damages for negligence excluded); <u>Trans-Spec Truck Serv. Inc. v. Caterpillar Inc.</u>, 524 F.3d 315 (1st Cir. 2008)(same); <u>Boston Helicopter Charter, Inc. v. Augusta Aviation Corp.</u>, 767 F. Supp. 363 (D. Mass. 1991) (consequential damages based on breach of contract, negligence and breach of warranty barred by contract exclusion on consequential damages); <u>Agri-Mark, Inc. v. Niro</u>, 233 F. Supp. 200, 209 (D. Mass. 2002) (damage limitation clause excluding contract, tort and negligence claims barred plaintiffs' claims for negligence, breach of contract and breach of warranty claims); <u>Logan Equip. Corp. v. Simon Aerials, Inc.</u>, 736 F.Supp.1188 (D. Mass. 1990) (limitation of liability provision barred consequential damages and breach of warranty claim); <u>Genesis II, LLC v. Chan,</u> 10-P-302, 2011 Mass. App, Unpub. LEXIS 780 (Mass. App. Ct. June 13, 2011) (liquidated damage clause barred breach of good faith and fair dealing claim). Under Massachusetts law, however, "a party may not contract out of fraud." <u>Turner v. Johnson & Johnson</u>, 809 F.2d 90, 95 (1st Cir. 1986).Therefore, the Court considers Vitex's Intentional Misrepresentation claim and Chapter 93A claim which is based on CAI's alleged misrepresentations as falling outside the limitation of damages provision in CAI's invoice. And, a limitation of damages provision will not bar a Chapter 93A claim where the claim is not merely duplicative of the breach of contract claim. <u>See</u> <u>Canal Elec.v. Westinghouse Elec. Corp.</u>, 548 N.E.2d 182 (1990).

principles. That, Sartorelli may have written an email (not to Vitex) on the same day containing much the same (or identical) statement fails in any way to change the analysis of whether Vitex has undisputed evidence that Sartorelli made the statement to Vitex. (Id. at 7.)

Several other points bear mention.  First, proving that CAI's ink was contaminated and that it made a knowingly false statement to Vitex regarding the ink forms an important part of Vitex's claims. Vitex makes much ado of Troy Chemical's statement on December 12, 2012, that samples sent from CAI were "heavily contaminated as received." (VSOF ¶¶ 102, 107.) But, the undisputed evidence shows that Troy asked for untreated samples, and CAI sent untreated samples. (Ex. 56.) This enabled Troy to evaluate both the untreated materials and the efficacy of certain treatments it applied. CAI submits admissible evidence that the inks it sent to Vitex were treated, not untreated. (Exs. 75, 86.) For summary judgment purposes that ends the matter-- Troy's report does not show that when CAI made statements such as: "[a]t this point we have not encountered material that indicated positive for containing bacteria or fungi," (RVSOF ¶ 166), the statements were necessarily knowingly false (or even necessarily false).

Second, Vitex sees intentional misrepresentation arising from Exhibit 26, which provides some evidence that as of March 29, 2012, CAI understood its clay extender (or perhaps just one batch of the clay extender) contained mold. The summary judgment evidence before the Court tells a different story.  CAI responded to this information by putting biocides into the clay extender beginning in March of 2012. (RVSOF ¶ 15, 39.) CAI also submits evidence that clay extender was not a stand-alone product; it was designed for use only by mixing it with other CAI products which already contained various biocides. (Id.) Viewing the evidence in the light most favorable to CAI, as the law requires, this means that CAI could have discounted the significance of finding mold in the clay extender, for purposes of creating odors in printed products, because

the biocides already in the inks mixed with the clay extender would, to CAI's way of thinking, have eradicated the mold. Finally, on May 21, 2012, CAI was informed by Royal Analytical Services Laboratory that its clay extender when treated contained no mold. (Ex. 31; RVSOF ¶ 41.) At least for summary judgment purposes, the evidence submitted shows a problem developed with a small number of customers with a relatively small number of complaints, CAI responded, learned that some of its clay extender at that time contained mold, treated it, learned with treatment it did not contain mold, and thereafter treated the clay extender. This evidence does not show, especially on Vitex's motion for summary judgment, that all of CAI's ink (and certainly there is admissible evidence documenting an absence of problems in CAI's inks) or that all of its clay extender was contaminated with mold, or that the biocides already present in other CAI products failed to sufficiently kill or suppress the mold when the other products were mixed with clay extender. The March 26, 2011, test result was not of a final ink product, but of the clay extender before mixing. The significance, if any, of the apparent failure to inform Vitex of the positive result for mold in the untreated clay extender presents an issue for trial.

Third, some admissible evidence reveals poor conditions in Vitex's printing plant. Perhaps, as Vitex contends, these conditions had no bearing on any issue before the Court, but this presents another fact question, the resolution of which has to await trial.

Fourth, the record shows additional substantial questions as to whether Vitex had odor complaints before or after using CAI ink, whether other sources identified in the record such as paper which tested positive for bacteria contributed to a bad odor, and whether the methodology of testing was appropriate (requiring expert testimony). Finally, there are also substantial issues relating to causation, materiality of breach, and reasonable reliance upon which Vitex will have the burden of proof at trial. Each of these issues present genuine issues of disputed material fact.

To be clear, the issues identified by the Court herein are not meant to be exhaustive, nor is it say that Vitex has no evidence in support of any of its claims. (See e.g. Ex. 55, Expert Report of samples taken on or around May 9, 2014.) The point is, summary judgment is simply not warranted. Viewing the evidence in the light most favorable to CAI, a reasonable jury could conclude that Vitex has failed to meet its burden of proof on some, or all, of the elements of each of its claims. Simply put, Vitex has not established that it is entitled to summary judgment on its claims.

CONCLUSION

CAI's Motion for Partial Summary Judgment is ALLOWED. Vitex's Motion for Summary Judgment for Declaratory Judgment that the Terms of CAI's Invoice Do Not Apply (Count 1) is DENIED, and CAI's Cross-Motion on Vitex's Count 1 is ALLOWED, in part. Vitex's Motion for Summary Judgment as to all its remaining Counterclaims is DENIED.

The parties are ordered to submit within fourteen (14) days of entry of this Memorandum and Order, a Joint Report indicating; (1) whether they request another mediation, and; (2) a proposed trial schedule.

SO ORDERED.

/s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge